**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **vs.** | ) | **DOCKET NO.   2:22-cr-157-NT** |
| | ) | |
| **JOHN WILSON** | ) | |

**DEFENDANT JOHN WILSON'S SENTENCING MEMORANDUM**

John Wilson respectfully submits this Memorandum in support of his position that five years of probation is sufficient, but not greater than necessary, to satisfy the statutory purposes of sentencing. 18 U.S.C. § 3553(a). Mr. Wilson's circumstances are complex; more so than the average individual who comes before this Court for sentencing, which is why the proposed downward departure from the guidelines is warranted. 18 U.S.C. § 3553(b)(2)(A)(ii); U.S.S.G. § 5H1.3 (mental and emotional condition) and § 5K2.13 (diminished capacity).

Although a sentence of probation constitutes a final judgment, 18 U.S.C. § 3562(b), the Court would nevertheless retain the power to resentence John up to the maximum penalties for this offense should he violate a condition of probation at any time prior to the expiration of the term of probation, 18 U.S.C. § 3565(a). This is a significant deterrent for John, who has indicated that complying with his conditions of release has been his number one priority. He will put the same effort into compliance with the terms of his probation where the stakes will be even higher. He understands that a violation of probation would likely result in a harsher sentence of incarceration than that which could be imposed next week. Probation also sends a message to the community that John's case is not over, and he still faces punishment for the underlying criminal offense, as opposed to a less severe penalty for a violation of supervised release, for example.

1

## INTRODUCTION

John is diagnosed with multiple disorders, including fetal alcohol spectrum disorder (FASD) and pervasive development disorder (now known as autism spectrum disorder).[1] 4th Amended Revised Presentence Investigation Report ("PSR") (ECF No. 57) ¶ 56. Due to his disabilities, he cannot perform practical everyday tasks, he cannot live independently, and he makes very few decisions on his own. When John turned eighteen years old, the Penobscot County Probate Court determined that he was an "incapacitated person" and in need of guardianship. At the time, "incapacitated person" was defined as:

> [A]ny person who is impaired by reason of mental illness, mental deficiency, physical illness or disability…to the extent that he lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person.

18-A M.R.S.A. § 5-101 (Repealed. Laws 2017, c. 402, § A-1, eff. Sept. 1, 2019). His mother and grandmother (now deceased) were appointed as his guardians. PSR ¶ 48. Since the age of twenty-seven, John has resided in group homes for adults with developmental disabilities. His mother makes all financial, residential, and medical decisions for him, and serves as his representative payee to manage his disability income. PSR ¶ 66. She is also John's primary source of emotional support and speaks to him on the phone every day helping him cope with the stressors of daily life. Her dedication is unparalleled.[2]

The Supreme Court's reasoning in *Atkins v. Virginia*, 536 U.S. 304 (2002) (abolishing death penalty for intellectually disabled individuals) is instructive. Drawing on neuroscience, the *Atkins* majority recognized that the severity of punishment must necessarily depend on an

---

[1] National Institute of Neurological Disorders and Stroke, PERVASIVE DEVELOPMENTAL DISORDERS, found at https://www.ninds.nih.gov/health-information/disorders/pervasive-developmental-disorders#:~:text=What%20are%20pervasive%20developmental%20disorders,by%203%20years%20of%20age (last visited April 16, 2024).

[2] See Letter of Support from Sheila Wilson dated May 24, 2023, marked as Def's Ex. 9.

offender's culpability, stating:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others…Their deficiencies do not warrant exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 318.

> Because of their disabilities in areas of reasoning, judgment, and control of their impulses, however, they do not act with the level of moral culpability that characterizes the most serious adult criminal conduct.

Id. at 306–07.

As in Daryl Renard Atkins' case, John's developmental disabilities mitigate his culpability.

He cannot function in this world without significant interventions. He lives in bubble. He requires

<u>constant</u> monitoring. Staff at his group home must be awake, even when John is sleeping.

According to Elise Magnusson, Psy.D., LCSW who evaluated John in December 2023:

> Mr. Wilson should be in a residential program for people with developmental disabilities. Specifically, one which has demonstrated an ability to understand and manage people who have engaged in problematic sexual behavior. The staff that work with him should be trained to help him integrate his sex offense specific treatment into his daily life…and appreciate his risk to reoffend.[3]

Granite Bay Care Inc. is an organization in southern Maine that provides the residential program

that John needs. According to John's case manager, Nancy Francis, Granite Bay is willing to work

with John, and he could transition to one of their residences when a bed becomes available in the

relatively near future. If John is sent to prison, it is unclear what will happen to him after he serves

a sentence. His mother is elderly. His case manager cannot work with him from an out-of-state

---

[3] March 25, 2024 Psychosexual Evaluation and Report by Elise C. Magnuson, Ph.D., LCSW (Magnuson Report), marked as Def's Ex. 1, at 12.

prison. The Bureau of Prisons will not arrange for his transition to supportive housing for adults with developmental disabilities at the end of a sentence. U.S. Probation cannot provide the support John will need. Only a sentence of probation would ensure that John receives the services and supports he needs. And this is what the community needs, as well.

Five years of probation is an unusual sentence that fits John's unusual circumstances. This Memorandum explains why, and in so doing, it will be clear that John has in fact accepted responsibility for his offense, contrary to U.S. Probation's opinion. PSR ¶ 18A.

A. **FETAL ALCOHOL SPECTRUM DISORDER IMPACTS BEHAVIOR AND IS ASSOCIATED WITH INAPPROPRIATE SEXUAL CONDUCT.**

Fetal alcohol spectrum disorder (FASD), a lifelong condition resulting from prenatal alcohol exposure, creates a host of adverse conditions including executive function deficits for the affected individual.[4] The Centers for Disease Control and Prevention (CDC) recognize that individuals with FASD are at increased risk for cognitive disorders, mental illness, and psychological disorders. Individuals with FASD are also at higher risk for displaying inappropriate sexual behaviors, as seen in fifty-two percent of adults with FASD.[5] Neuropsychological research suggests that impairments to executive function (i.e., memory, ability to learn from punishment and consequences, lack of inhibitions, and impulsivity) contribute to why individuals with FASD engage in inappropriate sexual acts.[6] In fact, the "likelihood of involvement in the criminal justice

---

[4] Jerrod Brown et al., *Fetal Alcohol Spectrum Disorders (FASD) and Sexually Inappropriate Behaviors: Important Reminders for Criminal Justice and Forensic Mental Health Professionals*, CONCORDIA UNIVERSITY, ST. PAUL, December 1, 2016, https://www.csp.edu/publication/fetal-alcohol-spectrum-disorders-fasd-and-sexually-inappropriate-behaviors-important-reminders-for-criminal-justice-and-forensic-mental-health-professionals/.
[5] *FASDs and Secondary Conditions*, CTR. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/ncbddd/fasd/secondary-conditions.html#:~:text=People%20with%20FASDs%20are%20at,in%20sexually%20inappropriate%20behavior%20increases (last visited July 18, 2023).
[6] Brown et al., *supra* n.3, citing Fred J. Boland, Albert E. Chudley & Brian A. Grant, *The challenge of*

system for crimes associated with sexual misconduct may be increased by deficits in executive function, including those caused by FASD.[7]

Individuals with FASD function significantly below their chronological age emotionally, intellectually, and behaviorally. They lack the ability to link an initial act to subsequent consequences or damage which adversely affects the ability to determine appropriate behaviors for a given situation. And they possess a limited capacity of impulse control which results in impulsive responses to thoughts and feelings without intentionality or consideration of the consequences.[8]

Executive functioning is the only neurological process in the brain that involves conscious cognition. The impact of FASD on executive functioning substantially compromises the capacity to make rational choices and control impulses.[9]  Thus, individuals with FASD struggle to control inappropriate emotions and urges.[10]  As noted in one research article expounding on FASD and diminished culpability, "the need to make independent decisions in complex situations while simultaneously dealing with strong impulses and emotions requires effectively handling multiple abstract cognitive processes simultaneously, which is well beyond the biological capacity of those

---

*Fetal Alcohol Syndrome in adult offender populations*, 14 F. ON CORR. RSCH. 61, 61-64 (2002); Erica Clark et al., *Secondary disabilities among adults with fetal alcohol spectrum disorder in British Columbia*, 2 FETAL ALCOHOL RESEARCH 1, 1-12 (2004); Piyadasa W. Kodituwakku, Wendy Kalberg & Philip May, *The Effects of Prenatal Alcohol Exposure on Executive Functioning*, 25 ALCOHOL RSCH. & HEALTH, 192, 192-98 (2001)..

[7] *Id*., citing Natalie Novick Brown, Paul D. Conner & Richard S. Adler, *Conduct-Disordered Adolescents with Fetal Alcohol Spectrum Disorder: Intervention in Secure Treatment Settings*, 39 CRIM. JUST. & BEHAV. 770, 770-93 (2012).

[8]  Brown et al., *supra* n.3.

[9]  Natalie Novick Brown & Stephen Greenspan, *Diminished culpability in fetal alcohol spectrum disorders (FASD)*, 40 BEHAV. SCI. & THE L. 1, 2, 4 (2022).

[10]  *Id*., citing Piyadasa Kodituwakku & Elizabeth Kodituwakku, *Cognitive and Behavioral Profiles of Children with Fetal Alcohol Spectrum Disorders*, 1 CURRENT DEVELOPMENTAL DISORDERS REPORTS 149, 149-60 (2014).

with FASD."[11]   Additionally, FASD "explains both *cause* and *effect* regarding thinking and behavior in criminal acts" in that an FASD diagnosis "provides the court with evidence that a birth mother's substance abuse, over which her offspring had no control, produced a substantial mental defect" that directly influenced the offensive conduct due to impaired impulse control and rationality.[12]

### B.   LIKE FASD, AUTISM SPECTRUM DISORDER IMPACTS BEHAVIOR AND IS ASSOCIATED WITH INAPPROPRIATE SEXUAL CONDUCT.

Autism spectrum disorder (ASD) is a neurodevelopmental disorder marked by deficits in reciprocal social communication and the presence of restricted and repetitive patterns of behavior.[13]  Research suggests a connection between ASD and sexual offending. ASD impacts social interactions, communication, and behavior. Symptoms of ASD include obsession or preoccupation, failure to conform to social conventions, and a limited understanding of appropriate behavior.[14]  These symptoms can lead to inappropriate sexual conduct, including repetitive or obsessive behavior, and preoccupations or fixations on people or objects. Limited experiences in intimate relationships can lead to difficulty expressing sexuality within the context of an appropriate relationship.[15]  When the symptoms of ASD combine with a desire for attachment or

---

[11]  *Id*. at 5, citing Stephen Greenspan et al., *FASD and the Concept of "Intellectual Disability Equivalence"*, *in* FETAL ALCOHOL SPECTRUM DISORDERS IN ADULTS: ETHICAL AND LEGAL PERSPECTIVES 241, 241-66 (2016); Piyadasa W. Kodituwakku, *Neurocognitive Profile In Children With Fetal Alcohol Spectrum Disorders*, 15 DEVELOPMENTAL DISABILITIES RSCH. REV. 218, 218-24 (2009); Natalie Novick Brown, *Fetal alcohol spectrum disorders (FASD): Intellectual disability equivalence*, *in* ADULTS WITH FETAL ALCOHOL SPECTRUM DISORDERS: DIAGNOSIS, SCREENING, INTERVENTION, AND ADDICTION PREVENTION (2019).

[12]  *Id*. at 9.

[13]

https://www.cdc.gov/ncbddd/autism/signs.html#:~:text=Autism%20spectrum%20disorder%20(ASD)%20is,%2C%20moving%2C%20or%20paying%20attention   (last visited on April 16, 2024).

[14]  Clare Allely, *Sexual Offending Behaviours: Urgent Need for 'Autism Sensitive Risk Assessment Guide'*, UNIV. OF GOTHENBURG at 17 (Feb. 27, 2018), https://www.gu.se/en/gnc/sexual-offending-behaviours-urgent-need-for-autism-sensitive-risk-assessment-guide..

[15]  *Id*., citing Clare S. Allely & Ann Creaby-Attwood, *Sexual offending and autism spectrum disorders*, 7

sexual relations, the result can be sexually offensive conduct, including accessing inappropriate sexual material online.[16]

Because individuals with ASD can be socially isolated and immature, they frequently are more interested in befriending people younger who are on their maturity level.[17] Research instructs that some individuals with ASD naturally view child pornography to understand sexuality within the privacy and security of their own home.[18] In short, "ASD can predispose individuals to be drawn to pornography in general and child pornography in particular . . . [and] when considering ASD and sexuality, we are often talking about people with strong sexual impulses, little or no information about healthy sexual behavior, and few suitable outlets for sexual gratification."[19]

## C. JOHN'S NEUROPSYCHOLOGICAL PICTURE.

### 1. 2018 Neuropsychological and 2021 Forensic Evaluations

Neuropsychological testing throughout John's life reveals that John lacks the cognitive resources to consider the consequences of his actions, and to control his impulses. His most recent neuropsychological examination in 2018 by Caroline R. Hollnagel, Ph.D. identified "numerous

---

JOURNAL OF INTELL. DISABILITIES & OFFENDING BEHAV. 35, 35-51 (2016); Daniel C. Murrie et al., *Asperger's Syndrome in Forensic Settings*, 1 INT'L J. OF FORENSIC MENTAL HEALTH 59, 59-70 (2002).

[16] Allely, *supra* n.13 at 4.

[17] Eustacia Cutler, *Autism and Child Pornography: A Toxic Combination*, The Daily Beast (August 5, 2013), https://www.thedailybeast.co Allely, *supra* n.13, m/autism-and-child-pornography-a-toxic-combination (quoting autism psychologist and researcher Gary Mesibov).

[18] Allely, *supra* n.14, citing Gary Mesibov & Melissa Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *in* CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM: AUTISM, DEVELOPMENTAL DISABILITIES, AND SEX OFFENSES 64, 64-93 (Lawrence A. Dubin & Emily Horowitz ed., 2017).

[19] Dennis P. Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, *in* CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM: AUTISM, DEVELOPMENTAL DISABILITIES, AND SEX OFFENSES 112, 113, 117 (Lawrence A. Dubin & Emily Horowitz ed., 2017).

impairments across a number of domains including fluency (letter, semantic, design and math),

inhibition…listening comprehension, reading comprehension…poor adaptive functioning in

communication, daily living skills, and socialization." [20] John's Full Scale IQ is 74, and his

processing speed index is 68, which is in the impaired range. [21] PSR ¶ 58. Dr. Hollnagel's

psychological impressions were as follows:

> Specifically, The Vineland Adaptive Behavior Scales - Third Edition was used to evaluate Mr. Wilson's ability to do what most people do in their daily lives compared with other people his age. His mother and his caretaker both answered and were in agreement on all items. Mr. Wilson's overall adaptive functioning is in the severely impaired range. **Specifically, he was impaired in three areas. His ability to listen and understand, express himself through speech, and his reading and writing were severely impaired at the <lst percentile. Similarly, his ability to perform the practical everyday tasks of living appropriate for his age was also severely impaired at the 1st percentile. Finally, his functioning in social situations was also severely impaired at the <1st percentile.** In addition, Mr. Wilson's emotional response to daily life was elevated, he is experiencing more problems with his emotional response to life. His acting out in daily life was in the clinically significant range, meaning he is acting out at a rate well above the normal range compared to others his age. In particular, Mr. Wilson can often get so fixated on a topic that it annoys others, he wanders or darts away without regard to safety, is sometimes tricked into doing something that could cause harm, and when he is angry sometimes threatens to hurt or kill someone. His caretaker reported that he has said to staff, "I wish you were dead," and "She's going to pay," **but that they do not feel he means it and do not take it seriously**.[22]

Significant to John's underlying offense is Dr. Hollnagel's finding that John's ability to

inhibit a prepotent response fell in the severely impaired range.[23] "Inhibitory control" is

explained as follows:

> Inhibitory control, also known as response inhibition, is a cognitive process and one facet of executive function that permits an individual to inhibit their impulses and natural, habitual, or dominant behavioral responses to stimuli (i.e., learned prepotent responses) in order to select more appropriate behaviors that are consistent with one's goals. Self-control is an important aspect of inhibitory control. For example, successfully suppressing the

[20] March 27, 2018 Neuropsychological Evaluation Report by Caroline R. Hollangel, Ph.D, marked as Def.'s Ex. 2, at 7.
[21] *Id.* at 2.
[22] *Id.* at 6 (emphasis added).
[23] *Id.*

natural behavioral response to eat cake when one is craving it while dieting requires the use of inhibitory control. One form of inhibitory control relates to motor impulse control, sometimes referred to as stopping impulsivity.[24]

Thus, John's ability to self-control is severely impaired by his brain disorders. This conclusion was confirmed by Andrew Wisch, Ph.D., ABPP, who conducted a court-ordered examination in 2021 in connection with several pending state matters involving telephone harassment.[25] PSR ¶¶ 42-45. He writes:

> Mr. Wilson's problems with empathy, impulse control, and repeatedly failing to conform his behavior to societal expectations . . . are inextricably linked with his autism spectrum disorder and other developmental problems…Mr. Wilson's problematic behavior leading to the current allegations started occurring within a couple of months of his move from a group home in Hampden to his current residence. As is the case with most people with autism spectrum disorder, he struggles to adapt to change, and it appears likely that the stress associated with his move was one of the precipitating factors for his behavior. . . .
> With respect to the Court's specific question of "whether his historic diagnoses have any impact on his ability to control his behaviors," it is evident that Mr. Wilson's problematic behaviors are linked, at least in part, to his psychopathology. Specifically, once a pattern of behavior gets established, it can be extremely difficult for Mr. Wilson to disengage from that pattern, irrespective of the kinds of consequences that would deter most people. In this instance, once he began to make phone calls that he found reinforcing in some way, he persisted in doing so despite warnings that he would face legal consequences. This obsessive perseveration is likely linked to his autism spectrum disorder.

Of note, Dr. Wisch recognized that the change in John's group home was a precipitating factor for his acting out, which resulted in state criminal charges. John's situation at the same group home was also a precipitating factor for his federal offense, as explained next.

### 2. Supportive Housing, Behavior Interventions, and the Circumstances of the Instant Offense.

John lived with his mother and grandmother well into adulthood. PSR ¶ 50. After his first criminal convictions in 2012, and then a failed attempt at probation, John's mother and his

---

[24]  1 LI HAOLUN, ET. AL, *Neuroscience for Clinicians: Translation Clinical Neuroscience to Inspire Clinical Practice and Research, in* COMPREHENSIVE CLINICAL PSYCHOLOGY §1.08.2.3.2 145-167 (2d. ed. 2022) (internal citation omitted).

[25]  *See* Magnuson Report, *supra* n. 2 at 3-4.

treatment team determined that his needs were too significant for him to remain at home. Consequently, in 2014, John moved into a group home for adult individuals with intellectual disabilities and/or autism (private non-medical institution, or "PNMI"). PSR ¶¶ 18, 50.   PNMI's are state-regulated agencies. Aside from a short period in 2015 when he returned home to change group homes, John has resided in a PNMI since 2014.

John's group homes have provided various levels of interventions to manage his challenging behaviors (sexual offending history and other problematic behaviors, as well as alcohol abuse). These behavior interventions are governed by Maine statutes and regulations promulgated by Maine's Department of Health and Human Services (DHHS).[26] There are five levels of interventions for addressing challenging behaviors in a PNMI setting for disabled adults. Levels 1 & 2 fall into the category of "Positive Support Plans," which are minimally restrictive and a resident's participation in the plan is voluntary.[27] Levels 3-5 interventions fall into the category of "Behavior Management Plans," which are restrictive, imposed over the individual's objection, and coercive when necessary.[28]

By regulation, the first approach to managing challenging behaviors of residents must be through a Positive Support Plan. When these plans do not sufficiently manage challenging behaviors, a planning team must develop a Behavior Management Plan. Obtaining DHHS approval for a Behavior Management Plan is a complicated process and can take several months to complete. Once implemented, plans are reviewed on a quarterly basis and require ongoing approval.

---

[26]  34-B M.R.S.A §§ 5601- 5610 (Rights of Persons with Intellectual Disabilities or Autism); Code Me. R. Tit. 14-197 Ch. 5. (Regulations Governing Behavioral Support, Modification and Management For People with Intellectual Disabilities or Autism in Maine, hereinafter "Regulations").
[27]  Regulations @ 5.03-2 Tables.
[28]  Regulations @ 5.03-4.

According to John's mother, his case manager, and DHHS records, when John entered his first residence in 2014, he was subject to minimal intrusions to address his challenging behaviors. This level of intervention failed him, and he committed new offenses in 2015. PSR ¶¶ 38, 39.[29] After his 2015 convictions, he transferred to a new group home in Hampden, Maine where a "severely intrusive plan" was implemented to better manage his behaviors. This new plan essentially mirrored the conditions of his state probation,[30] which he completed without incident. After probation was terminated, John continued to be successful under higher level Behavior Management Plans for several years.

Near the end of 2020, John and the Hampden PNMI decided to part ways. In February 2021, John moved from the group home in Hampden to a new group home in Steep Falls, Maine which was managed by a new agency (referenced in Dr. Wisch's report). In addition to the stress of changing residences (recognized by Dr. Wisch), the move also created a lapse in the monitoring of John's previous Behavior Management Plan, and without the guardrails of targeted interventions, John began engaging in challenging behaviors, some of which resulted in new criminal charges, referenced above.

By the Fall of 2021, a new Behavior Management Plan was implemented at the Steep Falls residence. It included telephone restrictions, and supervised internet use.[31] John did well with

---

[29] John was charged with the state offense of Failure to Comply with the Requirements of Sex Offender Registration. PSR ¶ 40. This occurred when he briefly resided with his mother in between group homes. *Id.* As reflected in Def.'s Ex.3, John's failure to register was due to incorrect legal advice provided to him and his mother by his attorney at the time who told them John did not need to register the temporary residence.

[30] Marked as Def.'s Ex. 4.

[31] A copy of the Fall 2021 Behavior Management Plan could not be found, but reference is made to these initial restrictions in Def.'s Ex.5, Behavior Management and HCBS Rights Modification Plan dated February 22, 2022, at 1 (intrusive interventions included no personal cellular telephone, restriction of right to dial telephone without supervision, supervised internet use, and intense community supervision).

these restrictions. However, during the Plan's quarterly review in February 2022, internet restrictions were deemed unnecessarily restrictive and <u>removed</u> from the plan.[32] Beginning in March 2022, reports of John's misconduct on the internet were received by law enforcement agencies. PSR ¶¶ 6-8. At the next quarterly review in May 2022, John's Behavior Management Plan was entirely <u>discontinued,</u> and interventions were minimized because agency staff did not keep necessary records to justify intrusions.[33]  Understandably concerned, John's mother and case manager began to look for a new group home. In the meantime, with low monitoring and no internet restrictions, John committed the underlying offense conduct in June 2022. PSR ¶¶ 9-10.

### 3.   Fall 2023 YouTube Voicemails

On September 2, 2022, John was arrested by federal authorities. PSR ¶ 1. When he was released on pretrial supervision on September 9th, he immediately moved into a new group home in Auburn, Maine, managed by a new agency, Legends. Rather than go through the arduous process to implement a new Behavior Management Plan, Legends monitored John in accordance with his federal Conditions of Release. Initially, John's conditions did not restrict his use of the telephone because his federal offense conduct was limited to internet use.

Since his release on September 9, 2022, John has complied with all court-ordered conditions, but for a missed treatment appointment. PSR ¶ 5. In the fall of 2023, John left several concerning voicemails for a YouTube video creator who criticized John's faith, Jehovah's Witnesses. PSR ¶¶ 5A & 18A. These voicemails and the surrounding circumstances were examined by Elise Magnusson, Psy.D., LCSW and are discussed below. Given the inappropriate

---

[32]  During the PSR interview, dates reflected in Paragraph 18 were estimated. DHHS records were received after the interview. The dates in this paragraph are accurate.
[33]  Behavior Plan Committee record dated May 4, 2022, marked as Def.'s Ex. 6.

nature of John's voicemails, all parties agreed to modify John's conditions to restrict his use of communication devices in late November 2023. (ECF No. 56). John has had no issues with compliance.

### 4. 2023/24 Psychosexual Evaluation

In September 2023, prompted by concerns around John's ability to understand his upcoming sentencing, Dr. Magnuson was contacted for consultation. Dr. Magnuson has extensive experience evaluating and treating individuals like John with developmental disabilities and mental health issues, who exhibit inappropriate sexual behaviors and become involved in the criminal system.[34] After confirming John's competency to proceed with his sentencing, Dr. Magnuson conducted a psychosexual evaluation in December 2023, a report of which is submitted herewith.[35] Dr. Magnuson's report pieces together John's neurocognitive profile, his history of challenging behaviors and criminal conduct, and the results of interventions and support systems throughout his life. She explains what it is like to be John, why John's diminished capacity mitigates his culpability for the underlying offense and recommends the best approach to lower John's risk of reoffending.

---

[34] Curriculum vitae of Elise Magnusson, Psy.D., LCSW, marked as Def.'s Ex. 7.
[35] Magnuson Report, *supra* n.2

### a) Dr. Magnuson explains what it is like to be John:

For those who are not used to working with them, it can be difficult to appreciate the internal world of people who have a developmental disability…When trying to understand the internal world of someone with a disability, it can be helpful to remember a time when you were in a room full of people smarter than you and you struggled to follow the conversation. It is like this for people with a developmental disability. They can often follow the broad strokes, but the nuances and implications are frequently lost. Often they are unaware that they are missing significant information and do not appreciate that they do not understand the situation… Many people with a developmental disability, especially the higher functioning ones, such as Mr. Wilson, frequently adopt a cloak of competence. That is, they will try and present themselves as understanding more than they do. This is often driven by an attempt to avoid the stigma and shame associated of having a developmental disability.[36]

### b) Dr. Magnuson explains why it is unreasonable to expect John to regulate his behaviors the way someone without his cognitive deficits can:

People with developmental disabilities (intellectual disabilities and autism are considered developmental disabilities) lack many of the internal resources that others have...For example, people who function like Mr. Wilson have difficulty considering long-term consequences, in large part because their working memory is so much smaller than others. A common analogy for working memory is a desktop. The bigger the desk, the more people are able to consider multiple things at once, and the smaller the desk, the fewer things they are able to consider. In Mr. Wilson's case, he is using a very small "desk" and cannot hold many things in his mind when making decisions. Many people who function like Mr. Wilson can follow and think about two or three step processes, but not the multistep process that would require thinking about what happens after engaging in an activity; *it is not that they will not consider the consequences, it is that they cannot because they do not have the cognitive resources to do so*.[37]

### c) Dr. Magnuson explains why the system designed to manage John's disabilities failed him:

Behavior management plans are designed to be temporary and to be pulled back. The problem with this approach in Mr. Wilson's case is that those working with him have fundamentally misunderstood his problems. Their plans, while they were in place, focused on increasing his freedom when he did not display target behaviors after a relatively short period of time, such as six months. This was not an effective plan because Mr. Wilson's sexual interest did not change in the time that he did not act out. That is, one of the major underlying problems did not change just because he had not acted on his sexual interest.[38]
***

---

[36] Magnuson at 10
[37] Magnuson at 9-10.
[38] Magnuson at 9.

Since people with developmental disabilities lack the internal resources to manage themselves, they need those around them to provide structure for them. In a perfect world, a behavior management plan provides the external structure while internal changes are being made. This is not what happened for Mr. Wilson. Those around him did not provide the level of structure that he requires and which he cannot provide himself.[39]

### D. JOHN DESERVES CREDIT FOR HIS ACCEPTANCE OF RESPONSIBILITY IN THIS CASE.

John has remorse. He is ashamed of his impulses, and he is ashamed that he acted on them. When confronted, he reported himself to the police. He is sad, and leads a sad life, trapped by neurocognitive conditions he cannot control and cannot fix.

He has taken this case extremely seriously. He has complied with all conditions of release. He has advocated for himself when he felt the staff at his group home were not monitoring him as required. Since October 2022, John has meaningfully engaged in individual counseling with John Carroll, L.C.P.C. at ESM and is making progress in treatment. In a recent letter, Mr. Carroll reports:

> As an outcome of cognitive-behavioral based treatment, Mr. Wilson has demonstrated the ability to reduce impulsivity and increase self-control. Mr. Wilson has increased pro-social behavior, decreased isolation, and increased natural supports. He has explored the dilemma of religious values in conflict with his behaviors. He has regularly completed behavioral tracking worksheets and has initiated several lifestyle changes to positively impact his health.[40]

John should not lose credit for acceptance because of the voicemails he left for the YouTube personality, O.M. *See* PSR ¶¶ 5A, 18A. These voicemails were reviewed by Dr. Magnuson and discussed with John. She writes:

> Mr. Wilson said he came upon [O.M.]'s Fireside Chat when he was looking for information on Danny Masterson. Mr. Wilson indicated that as he watched [O.M.]'s video he became angry because [O.M.] was "bad mouthing" Jehovah's Witnesses, which is Mr. Wilson's religion...Mr. Wilson indicated he called [O.M.] to let him know he was angry… He reports that when he said he was going to "keep an eye on you" he was referencing his YouTube

---

[39] Magnuson at 10.
[40] April 8, 2024 Letter, marked as Def.'s Ex. 8.

channel…Mr. Wilson's voicemails were discussed on [O.M.]'s Fire Side Chat, and as a result, Mr. Wilson began receiving threats of violence and other messages on his own YouTube channel. People were able to track him down because he provided the name of his channel. Mr. Wilson said that he was unable to respond to the comments on his YouTube channel because the device he used "wouldn't let" him. He called and left messages for [O.M.]'s Fire Side Chat, where he said that he did not engage in the behavior he is accused of in an attempt to try and thwart any more threats.[41]

… people like Mr. Wilson can have difficulty appreciating how other people will understand and interpret their actions. For example, he does not appreciate the difference between Madonna saying she had thought about blowing up the White House at a political rally versus him leaving a voicemail saying Biden should be assassinated. Likewise, he thought leaving a voicemail for [O.M.]'s Fireside Chat, where he said he took a plea deal for a crime he said he did not commit, would stop people from leaving messages on his YouTube channel. It is worth noting that Mr. Wilson did not consider if his message would be announced on YouTube, if he would be believed, or if the people who left the messages on his YouTube channel would hear it, nor did he consider if hearing it would even change their behavior.[42]

John did not make these statements about his guilt or potential punishment because he had not accepted responsibility. He made them because he was receiving threats, and his statements were a reaction to those threats. Accordingly, the Total Offense Level should be 23, not 26. PSR ¶ 34, and his guideline range with a Criminal History Category III should be 57-71 months. But as set forth herein, a guideline sentence is inapt in John's case.

E. **FIVE YEARS OF PROBATION IS THE APPROPRIATE RESOLUTION RIGHT NOW.**

Protecting the community by lowering John's risk of reoffending should be the most important purpose of a sentence in this case. Protecting the community is intertwined with providing John appropriate, adequate treatment. Dr. Magnuson explains the most effective way to treat John and minimize his risk of reoffending:

The single best way to assist Mr. Wilson in reducing his risk is to provide external scaffolding in the form of a behavior plan and have him work with skilled staff who understand his problems and how to best manage them.

---

[41] Magnuson at 7-8.
[42] Magnuson at 10.

\*\*\*

Mr. Wilson would benefit from sex offense treatment that is designed for people who have a developmental disability. The treatment will need to be modified in ways that include repetition of concepts more frequently, a slower pace, and more concrete language. Since people who have disabilities like Mr. Wilson can have difficulty generalizing from a lesson learned in one area to a similar area, his group home staff should know what he is learning in treatment and help him practice those skills in his home environment. In this way they will be able to help reinforce the concepts and help him apply the concept to new situations. Mr. Wilson has difficulty holding on to concepts, identifying when to use them, and then remembering the steps. His staff should support him by helping him identify when it is appropriate to use the skills he learned in treatment and the steps he should undertake. In this way, he will have repeated exposure to the ideas and be able to practice using them.

\*\*\*

Mr. Wilson is likely to benefit from multiple therapeutic interventions a week. Information will need to be presented multiple times before he is able to use it, let alone access it when in an emotionally heightened state. These interventions may take the form of skills groups, individual therapy, and group therapy for sexual offenders. He will benefit from using the information and concepts daily. It would be beneficial for him if his staff can remind him and work with him on what he learns from these treatments.[43]

\*\*\*

Mr. Wilson should be in residential program for people with developmental disabilities. Specifically, one which has demonstrated an ability to understand and manage people who have engaged in problematic sexual behavior. The staff that work with him should be trained to help him integrate his sex offense specific treatment into his daily life (as described above) and appreciate his risk to reoffend.[44]

According to the Sex Offender Management Coordinator at FMC Devens, the Bureau of Prisons does not have a program specifically for incarcerated adults with developmental disabilities. Thus, his extraordinary needs will not be met in prison. At present, Granite Bay can provide the treatment John needs. That is what the community needs as well.

Incarceration is not the answer at this point. Neither is a final sentence. John has never received the treatment he needs, but now he can. Given the uncertainty of John's sentence and the stress of a relocation, a placement at Granite Bay was not pursued following Dr. Magnuson's

---

[43] Magnuson at 11.
[44] Magnuson at 12.

recent recommendation, but his appropriateness for the program was confirmed by the agency. We should give John this opportunity to demonstrate long-term change, while maintaining control of the ultimate outcome in this case.


Your Honor's thoughtful consideration of this Memorandum is greatly appreciated.


Dated:   April 17, 2024                                    Respectfully submitted,

                                                                      /s/Heather Gonzales, Esq.
                                                                      Attorney for Defendant
                                                                      Assistant Federal Public Defender
                                                                      P.O. Box 595
                                                                      Portland, Me 04112-0595
                                                                      207-553-7070
                                                                      FAX: 553-7017
                                                                      Heather_gonzales@fd.org


**CERTIFICATE OF SERVICE**

I, Heather Gonzales, hereby certify that I have this date caused the within Sentencing Memorandum to be served upon Assistant United States Sheila Sawyer, Esq., by forwarding a copy to her via the Court's ECF System: sheila.sawyer@usdoj.gov.


Dated: April 17, 2024                              /s/ Heather Gonzales
                                                              Attorney for Defendant